## Parrott v. Bell National Bank.

(Decided September 30, 1915.)

Appeal from Knox Circuit Court.

Malicious Prosecution—Suit Against Bank.—In a suit against a bank for malicious prosecution where the only evidence tending to connect the bank with the prosecution was its refusal to pay the check drawn on funds deposited with it, held that the lower court properly gave a peremptory instruction to the jury to find for defendant, as the refusal of the bank to pay the check was not the proximate cause of the prosecution.

B. B. GOLDEN and J. F. CATRON for appellant.

D. B. LOGAN and JAMES M. GILBERT for appellee.

OPINION OF THE COURT BY JUDGE NUNN.—Affirming.

Claude Jackson had on deposit, subject to check, the sum of $100 in the Bell National Bank of Pineville. Jackson resided at a mining camp several miles away. His business with the bank consisted of the following transactions: On March 22, 1912, he sent, by an uncle, $90 for deposit to his credit. A pass book was properly made out in the name of Claude Jackson with this item entered upon it. The uncle delivered the pass book to Claude Jackson. In some way, unexplained, the bank entered this deposit on its ledger in the name of *Charlie* Jackson. There was no such person, at least in that section. On August 13th, 1912, Claude Jackson deposited $15, but

that item was properly entered on both the pass book and ledger. On October 30th, 1912, he drew a $5 check on his account and the same was paid in due course. In December, 1912, and while Claude Jackson had on deposit in appellee bank, as shown by the balance in his pass book, the sum of $100, he issued a check thereon to the appellant, John Edgar Parrott, for the sum of $20. The check was signed "Claude Jackson." Claude Jackson had no information of the mistake concerning the entry on the bank ledger of the $90 deposit in the name of Charlie Jackson. On the same day and shortly before the closing hour of the bank, Parrott presented the check for payment. The bank refused payment, and, as Parrott says, gave as a reason therefor that Jackson had no funds. Parrott testifies that the bank officials asked him several times if Jackson signed the check, and if he saw Jackson sign it. He assured them that Jackson did sign it, and, when payment was refused, told the bank officials that he, Parrott, knew that Jackson had money enough there to pay the check. When the bank persisted in its refusal to pay, Parrott says "I told them I was going to get cash on the check that night or that day." Parrott then went to Wallsend, several miles from Pineville, and that night transferred the check to a merchant named Byrley in payment for a pair of shoes at the price of $3, and the difference in cash. Parrott says that Byrley "asked me if the check was good and I told him it was; we talked on and I told him that the bank was closed at that time, and he said that if I would promise to make the check good he would give me the cash on it and I told him I would." Byrley says that Parrott told him he knew the boy who signed the check, and that it was good and would be paid; "that he (Parrott) would have got cash on it himself that evening but got in there too late for the bank; the bank was closed when he came in." This question was then asked of Byrley. "He didn't tell you that he himself had already been to the bank that evening during banking hours and tried to get the money on the check and it refused it?" Answer: "No, sir, he did not mention it   *   *   *   said the bank was closed when he went up there." The next day Byrley presented the check to the bank and payment was again refused for the reason, as Byrley says, "there was nothing in there; the best I remember he (the bank officer) said nothing there deposited in that boy's name." After some further con-

versation, the bookkeeper at the bank, as Byrley testifies, said to him "if he was in my place he would have him make it good," or, "he would have it fixed up or straightened up." Byrley says that he at once went to Parrott and Parrott agreed to meet him at the bank next day not later than 1 o'clock and "fix up that check." Parrott says he made an agreement with Byrley to meet him at the bank at that time and "bring this boy (Jackson) if I can get him." It is not clear from the testimony just where Parrott had to go to find Jackson, but, at all events, Parrott went over into Knox county to "visit relatives." He either saw or got into communication with Jackson, and Jackson could not or would not then go to Pineville to meet the engagement with Byrley. Byrley was at the bank according to his understanding of the engagement with Parrott, but when Parrott sent him no word, and did not appear by 1 o'clock he went to the Police Judge of Pineville and swore out a warrant charging Parrott with obtaining money under false pretenses. The sheriff of Bell county took this warrant to Knox county and there arrested Parrott and carried him back to Bell county for examination. Soon after Parrott reached Pineville, Jackson appeared. The bank seems to have then been made aware of the mistake in entering the $90 deposit on its books in the name of Charlie Jackson, and raised no further question about the right of Claude Jackson to draw the check and have it paid. In fact, Jackson then drew and cashed a check for $100, the amount of his balance, and, with the proceeds, paid to Byrley $20, and took up the check which Parrott had transferred to him. Parrott was then discharged from custody.

Parrott afterwards brought this suit against the bank for malicious prosecution, and the following, copied from the petition, is the gist of his action:

"Said bank and its officers and agents in management and control of its banking business    *    *    * wrongfully, maliciously, and without probable cause, and, in fact, without any cause, induced, caused, and instigated the said Byrley to institute a criminal prosecution and charge of obtaining money and property by false pretense against this plaintiff, etc."

The bank, being a corporation and having its place of business in Bell county, where the summons was served, demurred specially to the jurisdiction of the

Knox Circuit Court. This demurrer was overruled. The bank then answered and joined issue on the material parts of the petition. By another paragraph the bank set up affirmatively the details as to how by mistake the deposit of Claude Jackson was carried on its books partly in his name and partly in the name of Charlie Jackson. At the conclusion of the evidence for plaintiff, the court, on motion, directed a verdict for defendant. Plaintiff appeals, and presents the question of the correctness of this ruling.

We have already referred to some of the evidence. In order to show that the bank caused and instigated the arrest, Parrott introduced Byrley as a witness. Unless the testimony of this witness made out a case, then there was no case and the court properly directed a verdict.

On that proposition Byrley testifies that he waited at the bank until after 2 o'clock for Parrott to come and bring Claude Jackson with him. He then learned that Parrott had left Bell and gone to Knox county.

"Q. Then it was you went to the Police Judge in Bell county and procured the warrant of arrest for obtaining money under false pretense? A. Yes, sir. Q. Now, Mr. Byrley, did the president of the Bell National Bank, or anyone connected with the defendant company, have anything to do with that at all? A. Not any with me getting the warrant out they did not. Q. Did not ask you to do it or request that you do it? A. No sir, they did not tell me to. Q. You went of your own accord and got it? A. Yes, sir; the reason he did not show up according to the agreement and make some arrangement about it caused me to want to see where I was at. Q. Mr. Byrley, tell the jury whether or not you would have taken out or had that warrant of arrest taken out for plaintiff, Mr. Parrott, but for the fact that he failed to meet you at the bank according to his agreement with you and but for the fact that after he had thus failed you learned he had left Bell county and come to Knox county? A. No, sir, if he had showed up according to agreement I would not have sworn any warrant out for him."

After a careful reading of the testimony, the material part of which we have already quoted, we are satisfied that the lower court committed no error in giving the peremptory instruction. It is clear, the bank wrongfully refused to pay the check, and also said to Byrley that he ought to "make Jackson fix it up," or, "make it good."

But refusal to pay the check was not the proximate cause of Parrott's arrest, nor can it be said that the advice of the bank to have Parrott fix it up could amount to advice or direction by the bank to have him arrested.

Bank of Commerce v. Goose, 39 Neb., 437; 58 N. W., 84; 23 L. R. A., 190, was an action by Goose against the bank, suing to recover damages for his arrest and prosecution growing out of the refusal of the bank to honor a check which he had drawn thereon. The bank had refused to pay his check, though, perhaps, the refusal was not justified. The person to whom the check was issued swore to the affidavit which led to his arrest. The court said:

"It is evident that the petition was framed upon the theory that the bank was liable for the arrest and imprisonment of plaintiff, and the publication of that fact, whereby his credit was greatly damaged. The trial court, however, very properly held that these matters could not be charged to the bank for the mere fact of refusal to pay the check of the plaintiff, his prosecution and imprisonment and the published statements in relation thereto not being the natural results of such refusal."

Having reached the conclusion that there are no facts in evidence to make out a case against the bank, even if the action had been properly instituted in Knox county, it becomes unnecessary to consider the propriety of the court's ruling that the Knox Circuit Court had jurisdiction.

For the reasons stated, the judgment is affirmed.